UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

AI Plus, Inc. and IOC Distribution, Inc. on
behalf of themselves and all others similarly
situated,

Court File No. _08CV 5456 MJD/SRN_

        Plaintiff,

vs.

**CLASS ACTION COMPLAINT**

Petters Group Worldwide; Petters Company,
Inc.; Enchanted Family Buying Company;
Nationwide International Resources, Inc.;
Thomas Joseph Petters; Robert Dean White;
Deanna Coleman; Michael Catain; Larry
Reynolds; and John Does #1-10.

        Defendants

**SCANNED**

OCT 1 0 2008

U.S. DISTRICT COURT MPLS

Plaintiffs AI Plus, Inc. and IOC Distribution, Inc. are investment groups comprised primarily of the savings of over one hundred pastors, ministers, ministries and other non-profit organizations.   Plaintiffs, on behalf of themselves and all others similarly situated, by and through their attorneys, Zimmerman Reed, P.L.L.P., for this Class Action Complaint against Defendants, state as follows:

## NATURE OF ACTION

1.    Plaintiffs AI Plus, Inc. ("AI Plus") and IOC Distribution, Inc. ("IOC") (collectively, "Plaintiffs") on behalf of themselves and all persons similarly situated who have suffered injury as a result of providing financing to Petters Company, Inc. ("PCI") by entering into promissory notes with Metro Gem, Inc. ("Metro Gem").  Plaintiffs bring this class action against Defendants PCI; Petters Group Worldwide LLC ("PGW"); Nationwide International Resources, Inc. ("NIR"); Enchanted Family Buying Company ("Enchanted"); Thomas J. Petters ("Petters"); Robert Dean White ("White"); Deanna Coleman ("Coleman"); Michael

Catain ("Catain"); and Larry Reynolds ("Reynolds") (collectively, "Defendants") for their violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, as well as their violations of various other state and common laws.

2.     Plaintiffs and the Class have been severely injured in their business and property by a fraudulent scheme perpetuated by Defendants. This scheme has operated in secrecy since the mid-1990's and only recently came to light as a result of a federal criminal investigation into Defendants' misconduct. According to documents filed in connection with the ongoing federal criminal investigation, the primary method by which Defendants effectuated the fraud scheme involved Petters, his employees and his associates creating fictitious documents and then providing these documents to brokers and current and potential investors as evidence that PCI was buying and selling substantial goods and merchandise which PCI would then resell. In many instances, funds from investors were sent directly to the purported supplier of the merchandise, often Defendants NIR or Enchanted. In turn, NIR or Enchanted directed the funds to PCI (less a commission) without any merchandise. Petters and other persons would then fraudulently pledge the non-existent goods and merchandise as security for the investments.

3.     Plaintiffs and the Class have suffered devastating financial losses as a result of Defendants' racketeering and illegal scheme to defraud. Plaintiffs AI Plus and IOC are two related investment groups which invested the money of over one hundred pastors, ministers, ministries and other non-profit organizations in PCI as a result of Defendants' fraudulent representations. The investors and their families have suffered devastating financial losses as a result of Defendants' racketeering and illegal scheme to defraud. Many have lost their life savings.

4.     Both AI Plus and IOC provided investment/financing money to PCI by entering into promissory notes with Metro Gem, Inc. ("Metro Gem") as a result of false representations made by Petters, PGW and PCI. Defendants' representations to Plaintiffs were made through Metro Gem's principal owner and operator Frank Vennes ("Vennes"). Petters, PGW and PCI used Vennes to access Plaintiffs because of Vennes' connections and stature in the Twin Cities Christian community.

5.     Plaintiffs and the Class were lured into providing funds to PCI by Petters, purportedly to facilitate the purchase and sale of large quantities of electronics and other goods. In exchange for their investments, Plaintiffs and the Class were promised scheduled interest payments and the ability to withdraw their principal at any time with simple written notice. Unbeknownst to Plaintiffs and the Class, the goods Petters professed to be purchasing and selling with Plaintiffs' money (and with which PCI purported to secure its investment) were a total fiction—they never existed at all. Defendant Petters merely pocketed Plaintiffs' money or funneled it through his other, legitimate businesses.

## PARTIES

6.     Plaintiff AI Plus is a Minnesota assumed name entity with a federal tax identification number, doing business primarily in Minnesota and having its mailing address at P.O. Box 385346, Bloomington, Minnesota 55438.

7.     Plaintiff IOC is a Minnesota organization with a federal tax identification number, doing business primarily in Minnesota and having its mailing address at P.O. Box 386112, Bloomington, Minnesota 55438.

8.     Defendant PGW is a limited liability company duly organized and existing under the laws of the State of Delaware. PGW maintains its principal place of business at 4400 Baker

3

Road, Minnetonka, Minnesota 55343.

9.     Defendant PCI is a corporation duly organized and existing under the laws of the State of Minnesota.  PCI maintains its principal place of business at 4400 Baker Road, Minnetonka, Minnesota 55343.

10.     Defendant NIR is a corporation duly organized and existing under the laws of the State of California.  NIR maintains its principal place of business at 2346 Westwood Boulevard #6, Los Angeles, California 90064.

11.     Defendant Enchanted is a corporation duly organized and existing under the laws of the State of Minnesota.  Enchanted maintains its principal place of business at 701 West Highway 7, 2nd Floor, Excelsior, Minnesota 55331.

12.     Defendant Petters is a Minnesota resident residing at 655 Bushaway Road, Wayzata, Minnesota 55391.

13.     Defendant Robert Dean White is a Minnesota resident residing at 538 Grace Street, Excelsior, Minnesota 55331.

14.     Defendant Deanna Coleman is a Minnesota resident and maintains an office from which she engaged in the complained of misconduct at 4400 Baker Road, Minnetonka, Minnesota 55343.

15.     Defendant Michael Catain is a Minnesota resident residing at 4550 Enchanted Point, Mound, Minnesota 55364.

16.     Defendant Larry Reynolds is a Nevada resident residing at 15 Castle Oaks Court, Las Vegas, Nevada.

17.     Defendants John Does 1-10 are individuals and business entities who, along with the named Defendants, participated in a conspiracy to defraud Plaintiff and convert his

4

investments. They were active participants and beneficiaries of the fraud and other illegal actions described herein.

**JURISDICTION AND VENUE**

18.     This action arises out of violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, (18 U.S.C. §§ 1961-1968 under §§ 1962(a), 1962(c) and 1962(d) of the Act). It also seeks to recover damages and other available relief for violations of the Minnesota Uniform Securities Act, (Minn. Stat. § 80A.68), Minnesota Consumer Fraud statutes (Minn. Stat. §§ 326F.69, 325D.13, and 325D.44), and for violations of common law claims of fraudulent inducement, conversion and unjust enrichment.

19.     The Court has jurisdiction over Plaintiffs' federal claims under 28 U.S. C. §§ 1331 and 1337. The Court has jurisdiction over Plaintiffs' state and common law claims under 28 U.S.C. §1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

20.     Venue is proper in this District under 15 U.SC. § 22 and 28 U.S.C. § 1391 because some Defendants reside, transact business, or are found within this District, and a significant part of the events giving rise to the claims asserted herein arose in this District.

21.     The activities of the Defendants as described herein involved contracts for the interstate sale of goods and the use of the interstate mail and wires. Thus, the Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

**FACTUAL BACKGROUND**

**A. Defendants' Scheme to Defraud**

22.     At all relevant times for purposes of this Complaint, Petters was the sole or

5

principal owner and Chief Executive Officer of PGW, Petters' global holding company. In addition, Petters was directly or indirectly the sole or principal owner of PCI, one of the numerous business enterprises Petters owned.

23.    On September 24, 2008, federal authorities executed search warrants on several individuals and businesses in an attempt to uncover evidence regarding the fraudulent scheme described in this Complaint.

24.    The ongoing federal criminal investigation into Defendants' misconduct is based on information obtained from Defendant Coleman, a government informant and former participant in Defendants' scheme. The unsealed information Coleman provided has finally brought Defendants' fraudulent scheme to light after more than ten years of secrecy, and forms the basis of Plaintiff's present complaint.

25.    Among other things, Coleman as a government informant has provided information that PCI is the venture capital arm of numerous Petters enterprises. The money raised by Petters through PCI is used by Petters for his other business ventures and to support his extravagant lifestyle.

26.    The fraudulent scheme was perpetrated by Petters, Coleman (PCI Vice President of Operations); White (former PCI officer and current consultant to PCI), Catain (Enchanted), Reynolds (NIR), and other persons. The scheme began in the mid 1990s.

27.    Petters solicited investors to invest substantial sums in PCI. To induce the investors to invest, the investors were advised funds would be secured by transactions. Unbeknownst to the investors, those transactions were fictitious. Investors were then provided with false documents relating to the purchase and resale of merchandise. The fraudulent documents purport to evidence PCI purchasing merchandise from vendors such as NIR, located

6

in Los Angeles, California, and Enchanted, located in Excelsior, Minnesota. Additional purchase orders falsely detail PCI's sale of the same merchandise to stores such as BJ's Wholesale Club in Levittown, Pennsylvania and Sam's Club in Bentonville, Arkansas.

28.  The purchase orders and other documents in support of the transactions are entirely fabricated. PCI does not in fact buy merchandise from NIR or Enchanted. Nor does PCI sell merchandise as described in the purchase orders to BJ's Wholesale Club, Sam's Club or any other business. Petters uses these document to induce investors to invest money in his scheme.

29.  On occasion, investors sought to wire funds directly to NIR and Enchanted as payment for the fictitious purchase orders that had been provided by Petters and others to the investors. Reynolds (NIR) and Catain (Enchanted) have entered into agreements with Petters to receive these funds from investors and then send these funds to Petters, minus a percentage of the funds as compensation for their role in the scheme. This scheme deceived the investors into believing that PCI was actually reselling merchandise. In fact, PCI was not reselling any merchandise.

30.  Coleman, PCI's Vice President of Operations, created false purchase orders and invoices related to the purchase of merchandise from NIR and Enchanted. White, who remains a consultant to Petters, was responsible for creating the false purchase orders related to the fictitious sale of merchandise to BJ's Wholesale Club, Sam's Club, Costco, and Boscov's.

31.  Petters and others used the mail, FedEx, and interstate wire communications in furtherance of the scheme, by sending documents via mail and interstate commercial carrier, and communicating in interstate commerce via wire transfer, by email and telephone.

7

## B. Defendants' Fraud Against Plaintiffs AI Plus and IOC

32.  Metro Gem is a holding company owned and operated by Vennes through which Petters, PGW and PCI obtained financing from investors such as AI Plus, IOC and the Class. Petters, PGW and PCI solicited investments in Metro Gem by engaging Vennes to offer opportunities to invest in business transactions in which PCI purportedly purchased and re-sold large lots of electronics and other merchandise at a profit (in the manner described herein).

33.  IOC began investing in PCI in approximately 2001 after being introduced to the opportunity by Vennes, Metro Gem's principal owner. AI Plus began investing in PCI in November 2003, also by virtue of its relationship with Vennes. Vennes is an entrepreneur and businessman with extensive business and personal contacts both in Minnesota and around the nation. Vennes, individually and as the head of various business entities, conducts lawful transactions involving the purchase and resale of merchandise including precious metals, gems and other types of goods. Vennes also has extensive contacts in the Twin Cities Christian community and is a major philanthropic donor to dozens of charities and Christian ministries. Defendants Petters, PGW and PCI used Vennes to gain access to investors within the Christian community, including Plaintiff AI Plus.

34.  All of the investments made by AI Plus, IOC and the Class operated in fundamentally the same way, which involved the efficient shuttling of money to PCI through Metro Gem, and the shuttling of (fraudulent) transaction documents to Plaintiffs and the Class, also through Metro Gem.

35.  More specifically, on May 30, 2008, Plaintiff IOC entered into a $9,299,500 promissory note with Metro Gem. Also, on April 23, 2008, Plaintiff AI Plus entered into a $10,837,245 Promissory Note in its favor with Metro Gem. On July 14, 2008, Plaintiff AI Plus

8

entered into an interest-bearing $500,000 Promissory Note in its favor with Metro Gem, for a total investment of $11,337,245. All of the investors who provided money to Metro Gem in this manner created their own individual "pool" of financing at Metro Gem for PCI's use. PCI was able to take from the pool when it desired funds for a specific merchandise transaction. When PCI sought to do so, PCI executed a promissory note in Metro Gem's favor to which PCI attached documents detailing a specific merchandise transaction, as well as a security agreement pledging the merchandise involved as security for the loan. So, for example, whenever PCI took money from AI Plus's financing "pool," Metro Gem would then simply take the transaction papers and security interest from PCI and simultaneously assign them to AI Plus.

36.    Like other members of the Class, IOC's May 30, 2008 note and AI Plus's April 23, 2008 and July 14, 2008 notes were really "reinvestments" as they replaced expiring notes which were simultaneously retired when the new notes issued. From the time it began investing in PCI through Metro Gem, in November 2003, AI Plus similarly executed a new note each time the old one retired. Thus, IOC, IA Plus and all members of the Class maintained a standing "pool" of money at Metro Gem for the purpose of providing continuous financing to PCI. AI Plus, IOC and the members of the Class kept these "pools" open for PCI's use because PCI continually provided new transaction documents showing withdrawals from the "pools" for specifically detailed transactions, all of which made the investment situation look completely legitimate.

37.    By this scenario, in connection with each note entered by AI Plus, PCI efficiently sent fraudulent documents to AI Plus (through Metro Gem/Vennes) and AI Plus's money was efficiently sent to PCI (through Metro Gem/Vennes). While used as an efficient conduit,

9

Vennes has professed that he was at all times under the belief that all of the transactions underlying the investments he facilitated at Petters' behest were legitimate and that he sincerely believed the transactions memorialized in documents he was provided and which Petters and others described to him, were genuine. Vennes has maintained his complete innocence of any wrongdoing in connection with Defendants' scheme.

38.    As stated above, the arrangement between Plaintiffs, Metro Gem and PCI was efficient. Plaintiffs and the Class would loan money to Metro Gem via promissory notes that were continually "re-upped" with the understanding that Metro Gem would then re-loan the money to PCI, also via promissory notes, for the purchase and resale of large lots of electronic goods. As it turns out, PCI and the other Defendants were merely fabricating the merchandise transactions for which PCI obtained Plaintiffs' money and which PCI pledged as collateral. Examples of specific instances of this fraud scenario include the following:

a.  On June 10, 2008, PCI entered into a promissory note with Metro Gem in the amount of $5,100,000. PCI attached documents purporting to show that PCI was using the money to finance the purchase of 2,800 Hitachi presentation projectors from Defendant Enchanted for $5,259,800. The transaction documents also purported to show the sale of these projectors for $5,838,364 to Sam's Club. PCI secured the note from Metro Gem with the specific merchandise involved in the transaction. In turn, and according to the scenario described above, on June 10, 2008 Metro Gem simultaneously entered into a Loan Agreement and Security Agreement with AI Plus in which Metro Gem assigned its $5,100,000 PCI note and accompanying security interest to Plaintiff AI Plus as security for

promissory notes already outstanding (i.e. AI Plus's April 2008 and July 2008 notes.)    Based on information obtained from the ongoing government investigation, this transaction was a complete fabrication. Defendants caused this false representation to be sent via the United States mail to several recipients including Metro Gem and Plaintiff.

b.  On February 22, 2008, PCI entered into a promissory note with Metro Gem in the amount of $3,500,000.  PCI attached documents purporting to show the note was to provide financing for the purchase of 3,600 Canon zoom lens cameras from Defendant NIR for $3,511,260.  The transaction documents also purported to show the sale of these cameras for $3,897,468 to Sam's Club.  PCI secured the note from Metro Gem with the specific merchandise involved in the transaction.    In turn, and according to the scenario described above, on June 10, 2008, Metro Gem entered into a "Loan Agreement" with AI Plus in which Metro Gem assigned its $3,500,000 PCI note and accompanying security interest to Plaintiff AI Plus as security for promissory notes already outstanding. Based on information obtained from the ongoing government investigation, this transaction was a complete fabrication.  Petters, PGW and PCI caused this false representation to be sent via the United States mail to several recipients including Metro Gem and Plaintiff.

c.  On December 3, 2007, PCI entered into a promissory note with Metro Gem in the amount of $4,800,000.  PCI attached documents purporting to show that PCI was using the money to finance the purchase of 2,325

11

Samsung LCD televisions from Defendant Enchanted for $5,039,437.50. The transaction documents also purported to show the sale of these televisions for $5,593,764 to Sam's Club. PCI secured the note from Metro Gem with the specific merchandise involved in the transaction. In turn, and according to the scenario described above, on December 3, 2008 Metro Gem simultaneously entered into a Loan Agreement and Security Agreement with AI Plus in which Metro Gem assigned its $4,800,000 PCI note and accompanying security interest to Plaintiff AI Plus as security for promissory notes already outstanding. Based on information obtained from the ongoing government investigation, this transaction was a complete fabrication. Defendants caused this false representation to be sent via the United States mail to several recipients including Metro Gem and Plaintiff.

d. On November 5, 2007, PCI entered into a promissory note with Metro Gem in the amount of $2,840,000. PCI attached documents purporting to show that PCI was using the money to finance the purchase of 6,400 Gateway LCD monitors from Defendant NIR for $2,843,680. The transaction documents also purported to show the sale of these monitors for $3,156,448 to Boscov's. PCI secured the note from Metro Gem with the specific merchandise involved in the transaction. In turn, and according to the scenario described above, on November 5, 2007 Metro Gem simultaneously entered into a Loan Agreement and Security Agreement with AI Plus in which Metro Gem assigned its $2,840,000 PCI

note and accompanying security interest to Plaintiff AI Plus as security for promissory notes already outstanding. Based on information obtained from the ongoing government investigation, this transaction was a complete fabrication. Defendants caused this false representation to be sent via the United States mail to several recipients including Metro Gem and Plaintiff.

e. On July 16, 2007, PCI entered into a promissory note with Metro Gem in the amount of $2,720,000. PCI attached documents purporting to show that PCI was using the money to finance the purchase of 3,765 Sceptre LCD televisions from Defendant Enchanted for $2,720,212. The transaction documents also purported to show the sale of these televisions for $3,019,417.05 to BJ's Wholesale Club. PCI secured the note from Metro Gem with the specific merchandise involved in the transaction. In turn, and according to the scenario described above, on July 16, 2007 Metro Gem simultaneously entered into a Loan Agreement and Security Agreement with AI Plus in which Metro Gem assigned its $5,100,000 PCI note and accompanying security interest to Plaintiff AI Plus as security for promissory notes already outstanding. Based on information obtained from the ongoing government investigation, this transaction was a complete fabrication. Defendants caused this false representation to be sent via the United States mail to several recipients including Metro Gem and Plaintiff.

f.  On July 27, 2006, PCI entered into a promissory note with Metro Gem in the amount of $2,905,000. PCI attached documents purporting to show that PCI was using the money to finance the purchase of 11,470 Kodak Easyshare digital cameras from Defendant NIR for $2,905,449.75. The transaction documents also purported to show the sale of these cameras for $3,224,982.10 to BJ's Wholesale Club. PCI secured the note from Metro Gem with the specific merchandise involved in the transaction. In turn, and according to the scenario described above, on July 27, 2006, Metro Gem simultaneously entered into a Loan Agreement and Security Agreement with AI Plus in which Metro Gem assigned its $2,905,000 PCI note and accompanying security interest to Plaintiff AI Plus as security for promissory notes already outstanding. Based on information obtained from the ongoing government investigation, this transaction was a complete fabrication. Defendants caused this false representation to be sent via the United States mail to several recipients including Metro Gem and Plaintiff.

39.   It now clearly appears that the merchandise transactions for which Plaintiffs and the Class provided their investment were a complete fraud. As described throughout this complaint and in unsealed government documents, to induce Plaintiffs to continue executing promissory notes, agents and employees of PGW, PCI, and others, created documents and agreements that were entirely fictitious. In reality, no merchandise was ever purchased with Plaintiffs' money. Instead Petters, PGW and PCI took Plaintiffs' investment and used it to fund Petters' other business ventures and personally enrich the Defendants involved.

14

40.    Documents obtained by federal investigators while executing search warrants further indicate that Petters, PGW and PCI used Vennes and Metro Gem to obtain funds from investors, including Plaintiffs and the Class.    Listings of inventory seized by the government indicate numerous Metro Gem loan documents recovered from the global headquarters of PGW and PCI.    For example, on September 24, 2008, the government recovered the following documents from "storage" at PGW headquarters at 4400 Baker Road, Minnetonka, MN 55343:

  a. April – June 2007 Metro Gem paid promissory notes;

  b. Jan 07 – March 07 paid Metro Gem promissory notes;

  c. MGI promissory notes January- June 2006;

  d. PCI – Metro Gem promissory notes Jan – Dec 2004;

  e. Promissory notes Dec 07 Metro Gem notes;

  f. Metro Gem 2003 promissory notes and financials.

41.    Further, a recent government affidavit in support of a complaint seeking to seize the assets of numerous persons related to the scheme indicated that a confidential government witness, now learned to be Defendant Coleman, informed the government "that Petters and PCI have provided false documents via email to Vennes at his offices in Minnesota and Florida."

42.    PGW, PCI, Petters, Enchanted, NIR and the other named and unnamed Defendants intentionally and knowingly participated in this fraudulent scheme.    They formulated, executed, and directed the creation of false documents, and falsely represented facts material to the investment transactions as a part of this scheme.

43.    Based on information obtained from the ongoing federal criminal investigation, all or nearly all of the merchandise transactions with which PCI solicited Plaintiffs' investments were fictional. Upon the expiration of each note, Metro Gem executed a new note

15

in Plaintiffs' favor. In true Ponzi scheme fashion, each time one of Plaintiff's promissory notes expired, Petters solicited a new note via Metro Gem and, again via Metro Gem, paid the interest due on the old note, presumably with funds obtained from other investors.

44.    Devastatingly, now that Defendants' decade-long pattern of fraud and racketeering has been exposed, the Named Plaintiffs' combined $20,636,745 investment has vanished along with all interest currently owing to Plaintiffs. The money lost by IOC and AI Plus represents the lost life savings of many local pastors, churches and other non-profit organizations

## CLASS ACTION ALLEGATIONS

45.    Plaintiffs reallege all previous paragraphs as if fully stated herein.

46.    Plaintiffs bring this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to all applicable provisions of Rule 23 of the Federal Rules of Civil Procedure.

47.    The Proposed Class which Plaintiffs seek to represent ("Class") is composed of:

All persons and entities within the United States who, from January 1, 1995 to the present, entered into promissory notes with Metro Gem, Inc. based upon a purported financing arrangement with Petters and/or PCI for the legitimate purchase and resale of merchandise to retailers, and who have suffered injury because the merchandise transactions Petters and/or PCI claimed to be supporting the financing were in fact fabricated and fraudulent.

48.    Plaintiffs specifically exclude from the Class all Defendants and any related entities from the proposed Class, all subsidiaries or affiliates of Defendants; any entity in which any Defendant has a controlling interest; and any and all of Defendants' employees, affiliates, legal representatives, heirs, successors or assignees.

49.    Plaintiffs also specifically exclude from the Class the Judge and Magistrate assigned to this case and any member of their immediate families.

50.     As shown below, this class action satisfies all requirements under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, including but not limited to as numerosity, commonality, typicality, adequacy and superiority.

51.     **Numerosity.**   Consistent with Rule 23(a)(1) of the Federal Rules of Civil Procedure, the proposed Class "is so numerous that joinder of all members is impracticable." On information and belief, based on information obtained from the ongoing criminal investigation, news reports in the public media, and investigation of counsel, the number of members of the proposed Class is believed to be in the hundreds.

52.     **Commonality.**   Consistent with Rule 23(a)(2) of the Federal Rules of Civil Procedure, the proposed Class shares "common questions of law or fact." Defendants engaged in a common course of misconduct toward Plaintiffs and members of the proposed Class, including but not limited to inducing investments from Plaintiffs and the Class by fraudulently claiming those investments to be supported by merchandise transactions which never occurred; making misrepresentations to persons known to Plaintiffs and the Class with the intention that those misrepresentations would be passed on to Plaintiffs and the Class to induce them to give money to PCI; falsifying documents to create fictional merchandise transactions; and using the money obtained from Plaintiffs and the Class not to fund merchandise transactions but to personally enrich Defendants and their other businesses. This common course of misconduct, resultant injury to Named Plaintiffs and the other members of the Class and the remedies available to all such persons demonstrate the propriety of class certification.

53.     **Typicality.**   Consistent with Rule 23(a)(3) of the Federal Rules of Civil Procedure, the claims of the proposed Class representatives, "are typical of the claims ... of the class." Plaintiffs and all members of the proposed Class who provided investment money to

17

Defendants by entering into promissory notes with Metro Gem have suffered damages as a result of Defendants' wrongful acts and misconduct. The Named Plaintiffs' factual and legal claims arise out of the same uniform misconduct perpetrated by Defendants in a similar manner against both the Named Plaintiffs and members of the Class. Thus, the evidence and legal theories underlying the named Plaintiffs' claims are identical to those underlying the claims of all members of the putative class.

54. **Adequacy**. Consistent with Rule 23(a)(4) of the Federal Rules of Civil Procedure, the Named Plaintiffs "will fairly and adequately protect the interests of the class." Plaintiffs have no adverse or conflicting interests to the proposed Class members. The Named Plaintiffs have retained the law firm of Zimmerman Reed, P.L.L.P., who are competent counsel experienced in complex, class action and consumer fraud litigation and possess the necessary financial resources to adequately and vigorously litigate this class action.

55. **Predominance**. Consistent with Rule 23(b)(3) of the Federal Rules of Civil Procedure, common questions of law and fact predominate over individual issues. Common questions include but are not limited to the following:

- Did Plaintiffs and the Class enter into promissory notes with Metro Gem for the purported purpose of providing financing to PCI which would be used to purchase and resell electronic merchandise?

- Did PCI and other named and unnamed Defendants create false purchase orders to deceive Plaintiffs and the Class into believing their investments were being used for bona fide purchases?

- Did PCI secure promissory notes with merchandise that did not exist?

- Did Defendants mislead Plaintiffs and the Class by falsifying transaction documents?

- Did PCI's falsification of transaction documents cause Plaintiffs and the Class to suffer injury?

- Did any of the transactions PCI documented and provided as security for promissory notes actually occur?

18

- Are Plaintiffs and the Class entitled to relief under the RICO Act?

- Are Plaintiffs and the Class entitled to relief under Minnesota's consumer protection statutes?

- Are Plaintiffs and the Class entitled to relief under Minnesota's Uniform Securities Act?

- Are Plaintiffs and the Class entitled to relief for fraudulent inducement?

- Are Plaintiffs and the Class entitled to relief for conversion?

- Are Plaintiffs and the Class entitled to an accounting?

- Are Plaintiffs' claims barred in whole or in part by any of Defendants' affirmative defenses?

56. **Superiority.** Consistent with Rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is a superior method of resolving this action. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for the party opposing the Class and would lead to repetitious trials of the numerous common questions of law and fact. Plaintiffs know of no difficulty of any kind that would make a class action in this case unmanageable.

57. Proper and sufficient notice of this action may be provided to the Class members through actual notice to investors tracked by both Defendants and Metro Gem, among other methods of notice.

58. Plaintiffs and the members of the Class have suffered harm and damages as a result of Defendants' wrongful conduct as alleged herein. Absent representative action, Plaintiffs and the members of the Class will continue to suffer losses thereby allowing Defendants' violation of law to proceed without remedy, and allowing Defendants to retain the proceeds of its ill-gotten gains.

## COUNT I

## VIOLATION OF §1962(c) OF THE RICO ACT 18 U.S.C. §§ 1961-1968

59.     Plaintiffs incorporate here by reference all preceding paragraphs.

60.     Section 1962(c) of the RICO Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

61.     As described herein, Defendants Petters, PGW (by and through its employees), and PCI (by and through its employees) each have operated, managed, and used individual enterprises, including: (1) Reynolds; (2) NIR; (3) Catain; (4) Enchanted; and (5) Frank Vennes. In the alternative, Defendants Petters, PGW and PCI each operated and managed an association-in-fact enterprise with Reynolds, Catain, NIR and Enchanted. Defendants Petters, PGW and PCI operated, managed, and used each of these enterprises to engage in a highly profitable pattern of illegal fraud in direct violation of § 1962(c).

62.     Reynolds, NIR, Catain, Enchanted and Vennes each, separately, are an "individual, partnership, corporation, association or other legal entity" and therefore each constitutes a cognizable enterprise under § 1961(4) of the RICO Act.

63.     Defendants Petters, PGW and PCI used Reynolds, NIR, Catain and Enchanted to create sham transactions to defraud investors, including Plaintiffs. Defendants Petters, PGW and PCI used all of these enterprises both individually and as an association in fact enterprise to facilitate and carry out the pattern of racketeering activity which has injured Plaintiffs.

64.     In addition, Defendants Petters, PGW and PCI used Vennes to gain access to,

20

defraud, and obtain funds from Plaintiffs and the Class as described in detail above.

65.     The enterprises through which Defendants Petters, PGW and PCI engaged in their pattern of fraud were comprised of a consistent, ongoing structure of entities associated from the mid-1990's until the present day. For example, fundamentally all of the fraudulent merchandise transactions underlying all of the notes entered into by Plaintiffs involved phony purchases exclusively from NIR or Enchanted. Similarly, Petters, PGW and PCI used Vennes both individually and through his associated entities, such as Metro Gem, Inc., to access and defraud investors in the Twin Cities Christian community such as Plaintiffs and the Class.

66.     Petters, PGW and PCI each played a significant role in operating and managing the enterprises described herein in connection with each predicate act, including NIR, Enchanted and Vennes and, in the alternative, the association in fact enterprises comprised of Petters, PGW, PCI with Reynolds, NIR, Enchanted and Catain. In each fraudulent transaction described herein, Petters, PGW and PCI managed these enterprises by: (1) dictating the terms of and requiring the creation of false purchase orders by NIR and Enchanted; (2) providing Vennes with fraudulent documents and directing him to solicit and obtain investment money from investors, including Plaintiffs and the Class, based on the documents; and (3) directing agents, employees and others on behalf of Petters, PGW, PCI, NIR and Enchanted to prepare false documents, convey false messages to investors, brokers and others to maintain the scheme's viability and secrecy.

67.     In addition to the Defendants' direction described above in each example of specific instances of fraud, Defendants' operation and management, according to the criminal investigation, included (for example only) directing: (1) Coleman, as Vice President of Operations for PCI, to create fictitious documents for PCI; (2) Reynolds as the head of NIR to

arrange for representatives of insurance companies (insuring the fictitious goods) to tour warehouses of electronic goods owned by other companies, while representing that the goods were those sold to PCI; and (3) NIR (via Reynolds) to discourage auditors for investors from viewing the merchandise underlying the promissory notes by stating that the goods were in warehouses that were not accessible.

68.   Specific instances of Defendants' fraud are described above.   In each of these instances, Defendants caused funds to be wired from the Plaintiff investors to Metro Gem and from Metro Gem to PCI.   Further, in each instance, Defendants caused fraudulent promissory notes between PCI and Metro Gem and between the Plaintiff investors and Metro Gem to be sent through the U.S. Mails.  This conduct by Petters, PCI and PGW occurred repeatedly over the past decade.

69.   According to information obtained in the government investigation, Petters', PGW's and PCI's predicate activity of mail and wire fraud described herein has been ongoing from approximately 1995 to the present day.  Defendants have caused Plaintiff IOC to enter into fraudulent promissory notes since approximately 2001 and Plaintiff AI Plus since 2003.

70.   Plaintiff IOC has suffered serious injury to its business and property in the form of its lost $9,299,500 investment and lost interest payments on that investment.  Plaintiff AI Plus also suffered serious injury to its business and property in the form of its lost $11,337,245. These funds largely constituted the entire life savings of many pastors, ministers, ministries and other non-profit organizations.   Defendants Petters, PGW and PCI naturally, directly, and proximately caused these injuries by implementing their scheme to defraud and, using Vennes and other enterprises, inducing Plaintiffs and the Class to invest in an opportunity which, unknown to Plaintiffs, was a complete sham.

## COUNT II

### VIOLATION OF §1962(a) OF THE RICO ACT 18 U.S.C. §§ 1961-1968

71.    Plaintiffs incorporate here by reference all preceding paragraphs.

72.    Section 1962(a) of the RICO Act states:

It shall be unlawful for any person who has received any income derived, directly
or indirectly, from a pattern of racketeering activity... to invest, directly or
indirectly, any part of such income or the proceeds of such income, in acquisition
of any interest in, or the establishment or operation of, any enterprise which is
engaged in, or the activities of which affect, interstate or foreign commerce.

73.    Defendants Petters and PGW have illegally obtained significant amounts of
money through the pattern of racketeering described in this Complaint, including some
$9,299,500 currently invested by IOC and $11,337,245 invested by AI Plus.

74.    According to documents obtained in the ongoing federal criminal investigation,
Petters funneled portions of these illegal proceeds through his legitimate businesses.
Specifically, the federal documents aver, "The money raised by Petters through PCI is used by
Petters for his other business ventures and to support his extravagant lifestyle."

75.    Petters, both individually and by and through PGW, therefore directly violated
§1962(a) of the RICO Act by investing the money obtained illegally by racketeering into
Petters' other, purportedly legitimate, businesses. This funneling activity was purportedly done
to "launder" the racketeering proceeds, including those proceeds illegally obtained from
Plaintiff.

76.    Plaintiffs and the Class have suffered specific injury to their business and property
as a result of Petters' and PGW's violation of § 1962(a). By this money laundering activity,
these Defendants have deprived investors, including Plaintiffs and the Class, of their principal
investments and attempted to place that money outside the investors' reach should the scheme

23

ever come to light.

77.   Plaintiff ICO invested $9,299,500 with PCI, via MetroGem, in an outstanding promissory note.  Plaintiff AI Plus invested $11,337,245 with PCI, via MetroGem, in two separate outstanding notes of $10,837,245 and $500,000.  On information and belief, Petters and PGW have taken Plaintiffs' money out of PCI and funneled it through other Petters businesses, thereby effectively eliminating it from PCI's balance sheet and hiding it away from any claim by PCI investors, including Plaintiffs and the Class.  This violation of §1962(a) has naturally and proximately caused Plaintiffs and the Class significant injury to their businesses and property.

<strong>COUNT III</strong>

<strong>VIOLATION OF §1962(d) OF THE RICO ACT 18 U.S.C. §§ 1961-1968</strong>

78.   Plaintiffs incorporate here by reference all preceding paragraphs.

79.   Section 1962(d) states "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a)... or (c) of [18 U.S.C. §1962.]"

80.   Defendants White, Coleman, Catain, Reynolds, NIR and Enchanted each are RICO conspirators and have violated §1962(d).  Each of these Defendants both agreed to assist Petters, PGW and PCI in commiting violations of 18 U.S.C. §1962(c) and each committed overt acts of racketeering in furtherance of the scheme.

81.   Unsealed information obtained from the ongoing federal criminal investigation indicates the agreement and overt acts by each of these individually named Defendants as follows:

**Defendant White**

82.    According to government notes form a secret wiretap recording, Defendant White:

> [a]dmits that he, Coleman and Petters are 'co-conspirators' and that [White] maintains records related to the fraud scheme in an envelope that he at times keeps in his vehicle or takes home. White further describes the fraud scheme as a 'Ponzi scheme,' and estimates that at least $100 million of PCI's debt is fraudulent. White discusses cleaning out his office because he is worried.

83.    Further, White used a laptop with access to the PCI network to prepare false invoices related to the fictitious purchases from Sam's Club and BJ's Wholesale Warehouse.

84.    On October 8, 2008, Defendant White pled guilty to federal charges of mail fraud and illegal monetary transactions stemming from his role in creating and perpetuating the scheme described in this complaint.

**Defendant Coleman**

85.    Defendant Coleman's agreement to further the racketeering scheme was indicated by Defendant's White statement that he, Coleman and Petters are 'co-conspirators.'

86.    Coleman committed overt acts of racketeering by creating false purchase orders and invoices related to the purchase of merchandise from NIR and Enchanted.

87.    On October 8, 2008, Defendant Coleman pled guilty to federal charges of mail fraud and conspiracy stemming from her role in creating and perpetuating the scheme described in this complaint.

**Defendants Catain and Enchanted**

88.    The information obtained from the federal criminal investigation indicates that Catain is the sole operator of Enchanted, which operates out of a car wash in Excelsior, Minnesota.

89.   Further, Defendant Coleman, the government informant formerly involved in the scheme, indicated Enchanted has on more than one occasion received money directly from investors in payment of fraudulent purchase orders provided by PCI to investors.  Enchanted did not provide any merchandise to PCI or its affiliated entities.  Shortly after receiving the funds, Enchanted paid those funds over to Petters and PCI.

90.   Coleman, as a government informant, further indicated that several years ago, Catain stated he was no longer in the business of selling merchandise to PCI.  However, the fabricated documents provided by the government informant (Coleman) and Plaintiffs' records purport to indicate that Enchanted still annually buys and sells tens of millions of dollars of electronic merchandise.  In a six month period in 2008, PCI purportedly bought $23,142,459.50 in electronic goods from Enchanted that PCI then resold to Sam's Club.  Sam's Club has denied the validity of similar purchase orders presented to it for authentication by federal agents.

91.   On October 8, 2008, Defendant Catain pled guilty to federal charges based on his role in creating and perpetuating the scheme described in this complaint.  According to media reports, this "involved the creation of false bank statements and other documents that were used to trick investors into funding what they called a giant Ponzi scheme."

**Defendants Reynolds and NIR**

92.   In government wiretap recordings, Reynolds admitted to his participation in the fraudulent scheme described in this complaint.  Further, government analysis of wiretap recordings has confirmed Reynolds' and NIR's receipt of substantial sums of money as a result of the fraud.

93.    Unsealed information in the federal criminal investigation indicates Defendant Reynolds, a managing employee of NIR, has admitted Petters told him about the fake purchase orders, and that Reynolds has known about the illegal scheme for many years.   Reynolds further estimated the amount of the fraud to be in excess of $2 billion.

94.    Additionally, Defendant Coleman, the government informant, indicated that Reynolds acts as a conduit for funds provided by investors directly to NIR, which Reynolds then delivers to PCI and Petters, less a percentage as a commission.

95.    At Petters' request, Reynolds meets with and speaks to PCI's investors, falsely representing that his company is selling PCI large amounts of merchandise as depicted in the fictitious purchase orders.

96.    Reynolds has arranged for representatives of insurance companies (insuring the fictitious goods) to tour warehouses of electronic goods owned by other companies, while representing that the goods are those sold to PCI.

97.    Reynolds has discouraged investors' auditors from viewing the merchandise by stating that the goods were in warehouses that were inaccessible.

98.    The agreement to further the scheme of racketeering along with the overt acts in furtherance by White, Coleman, Catain, Reynolds, NIR and Enchanted has caused Plaintiffs to suffer significant injury to their business and property.   These violations of §1962(d) have naturally and proximately caused Plaintiffs significant injury to their business and property.

## COUNT IV

## VIOLATIONS OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
## MINN. STAT. § 326F.69

99.    Plaintiffs incorporate here by reference all preceding paragraphs.

100.   Minn. Stat. § 325F.69, subd. 1 provides:

27

The act, use or employment by any persons of any fraud, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

101. Petters, PCI, PGW, Enchanted, NIR, and the other named and unnamed Defendants engaged in deceptive practices and made statements and representations that led Plaintiffs and the Class to believe that, if they purchased a promissory note from Metro Gem with their investment funds, those funds would be used by PCI to purchase inventories of merchandise that would be resold at a substantial profit. Petters, PGW and PCI represented that retail stores had already agreed to purchase the inventories for a price higher than PCI had paid to acquire it.

102. However, retail stores had not in fact promised to pay a higher price for the purported inventory. PCI had fabricated both the inventory and the retail purchase orders.

103. The particulars of the representations and payment-inducing conduct are described above.

104. Defendants NIR, Enchanted and the other named and unnamed Defendants are subject to liability under Minnesota's consumer protection statutes because they were generally aware that Petters, PCI, and PGW were involved in the solicitation of funds for the fraudulent promissory notes, they were participating in the scheme and acquiescing in the transactions, and they were assisting Petters, PCI, and PGW in the perpetuation and execution of the violative conduct. Defendants NIR, Enchanted and the other named and unnamed Defendants were in a position to do something about the promissory note scheme, but instead did nothing but profit from it.

105. The merchandise at issue for purposes of this consumer protection count is not the inventory itself, but rather the promissory notes purportedly secured by the inventory, which fall within the meaning of "merchandise" under Minn. Stat. § 325F.68, subd. 2. Plaintiffs were the "end-user," i.e. the ultimate consumer, of Defendants' purportedly genuine promissory notes, and their level of sophistication is irrelevant under Minnesota's consumer protection statutes.

106. The success of this lawsuit will benefit the relevant purchasing public because (1) Defendants' conduct violated and violates the laws enumerated in Minn. Stat. § 8.31, subdivision 1, (2) Defendants' conduct and representations targeted many investors in the public at large, including numerous non-profit, charitable and religious organizations, and (3) successful prosecution of the claims advances state interests, even if the group of persons joining to seek damages is smaller than the targeted group.

107. Defendants' materially deceptive conduct and misrepresentations caused Plaintiffs and the Class to purchase promissory notes from Metro Gem and as a result have caused Plaintiffs to suffer damages that not only include the loss of guaranteed returns on their investments and the loss of substantial portions, or all, of their investment principal, but also include, without limitation, consequential and incidental damages.

108. As a direct, proximate and foreseeable result of Defendants' conduct, Plaintiffs and the Class sustained damages and are entitled to injunctive and equitable relief, including but not limited to restitution and disgorgement, and an award of attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

## COUNT V

## VIOLATIONS OF MINNESOTA UNLAWFUL TRADE PRACTICES ACT
## MINN. STAT. § 325D.13

109. Plaintiffs incorporate here by reference all preceding paragraphs.

110. Minnesota Statute § 325D.13 provides: "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

111. Defendants' acts and practices regarding its sale and participation in the sale of promissory notes to Plaintiffs and the Class constitute unlawful trade practices in violation of Minn. Stat. § 325D.13 because Defendants misrepresented the true quality of such products. Defendants promised that the notes would be secured by inventories of goods that did not exist and which no retail stores had agreed to purchase at a higher, or any, price.

112. Defendants' materially deceptive conduct and misrepresentations caused Plaintiffs and the Class to purchase promissory notes from Metro Gem and as a result have caused Plaintiff to suffer damages that not only include the loss of guaranteed returns on their investments and the loss of substantial portions, or all, of their investment principal, but also include, without limitation, consequential and incidental damages.

113. Defendants' conduct described herein constitutes a violation of Minnesota's Unlawful Trade Practices Act, Minn. Stat. § 325D.13 injuring Plaintiffs and the Class and entitling them to damages, injunctive and equitable relief, including but not limited to, restitution and disgorgement and an award of attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

## COUNT VI

## VIOLATIONS OF MINNESOTA DECEPTIVE TRADE PRACTICES ACT
## MINN. STAT. § 325D.44

114. Plaintiffs incorporate here by reference all preceding paragraphs.

115. Minnesota Statutes § 325D.44, subd. 1 provides:

> A person engages in a deceptive trade practice when, in the
> course of business, vocation, or occupation, the person:

>> ...(5) Represents that goods or services
>> have...characteristics, ingredients, uses,
>> benefits...that they do not have;

>> ...(7) Represents that goods or services are of a
>> particular standard, quality, or grade,...if they are
>> of another...

>> ...(9) Advertises goods or services with the intent
>> not to sell them as advertised;

>> ...(13) Engages in any other conduct which
>> similarly creates a likelihood of confusion or of
>> misunderstanding.

116. By engaging in the conduct described herein, Defendants violated and continue to
violate Minn. Stat. § 325D.44.

117. Petters', PGW's and PCI's acts and practices regarding its participation in the sale
of promissory notes to Plaintiffs and the Class amounts to wrongful conduct and
misrepresentation of the true characteristics, standards, quality, and grade of the promissory
notes:

a. Defendants represented that its promissory notes had characteristics, ingredients,
uses, benefits that they did not have, namely that they were secured by inventory
acquirable by Defendants and that retail stores had agreed to purchase such
inventory at a substantially higher price than was available to Defendants;

b. Defendants represented that PCI's promissory notes were of a particular standard,
quality, or grade, when they were of another, in that there was no inventory

available to act as security and that no retail stores had promised to purchase such inventory at a substantially higher price than was available to Defendants;

c.     Defendants advertised PCI's promissory notes with the intent not to sell them as advertised, in that the promissory notes were not secured by inventory and the inventory would not be sold to retailers as advertised;

d.     Defendants' conduct created a likelihood of confusion and misunderstanding because of their blatant, materially false statements as detailed above.

118.   As a result of Defendants' practices relating to the sale of promissory notes, Plaintiffs and the Class have suffered actual harm and will continue to suffer actual harm.

119.   Because Defendants willfully engaged in such trade practices knowing them to be deceptive, Plaintiffs and the Class are entitled to recover their costs and attorneys' fees under Minn. Stat. § 325D.45, subd. 2.

## COUNT VII

## VIOLATIONS OF MINNESOTA UNIFORM SECURITIES ACT MINN. STAT § 80A.68

120.   Plaintiffs incorporate here by reference all preceding paragraphs.

121.   Defendants' scheme involved the purchase and sale of a security.

122.   Defendants employed a scheme to defraud Plaintiff IOC out of $9,299,500 and Plaintiff AI Plus out of $11,337,245 under the guise of a security interest in merchandise that never existed.

123.   Defendants made numerous untrue statements of material fact as set forth above in order to execute and proceed with their promissory notes.

124.   As set forth above, Defendants engaged in acts and a course of business that operated as a fraud or deceit upon Plaintiffs and the Class.

125.   As a result of Defendants' fraudulent conduct, Plaintiffs and the Class have suffered actual damages in an amount to be determined at trial, but in excess of $9,299,500 plus

interest, costs and attorneys' fees in the case of IOC and $11,337,245 plus interest, costs and attorneys' fees in the case of AI Plus.

**COUNT VIII**

**FRAUDULENT INDUCEMENT**

126. Plaintiffs incorporate here by reference all preceding paragraphs.

127. As described more fully in the preceding paragraphs, Defendants and agents of Defendants made material misrepresentations to Plaintiffs and the Class.

128. The statements and representations by Defendants were materially false at the time they were made, were made with reckless disregard as to their truth or falsity, or were made without the present intent to perform them.  In particular, Defendants knew or should have known for all of the transactions described above:

a.  There was no inventory to secure any of the transactions supporting the notes executed in favor of Plaintiffs;

b.  There was no retail purchaser for any of the merchandise described in the transaction documents attached to the promissory notes;

c.  The invoices reflecting the purchases from NIR and Enchanted were fraudulent; and

d.  The invoices reflecting the sales to Sam's Club, BJ's Wholesale Club, Boscov's and others were fraudulent.

129. Defendants secretly used Plaintiffs' funds for purposes contrary to the promissory notes executed by Metro Gem.

130. The statements and representations made by Defendants were intended so that Plaintiffs would rely upon them to execute the promissory notes described herein and proceed

33

with them even if questions later arose.

131. Plaintiffs and the Class reasonably relied on Defendants' representations described herein to their detriment. Plaintiffs and the Class would not have entered into the promissory notes described herein absent such representations.

132. These fraudulent misrepresentations directly induced Plaintiffs to execute the promissory notes described herein. Accordingly, Plaintiffs have been damaged in an amount to be proven at trial, but in excess of $9,299,500 plus interest, costs and attorneys' fees in the case of IOC and $11,337,245 plus interest, costs and attorneys' fees in the case of AI Plus.

## COUNT IX

## CONVERSION

133. Plaintiffs incorporate here by reference all preceding paragraphs.

134. Plaintiff IOC provided money to PCI via Metro Gem by executing an outstanding promissory note on May 30, 2008. Plaintiff AI Plus provided money to PCI via Metro Gem by executing outstanding promissory notes on April 23, 2008 and July 14, 2008.

135. Petters, PGW, and PCI, through their intentionally fraudulent acts, wrongfully converted Plaintiffs' investments for their own benefit, and to the detriment of Plaintiffs.

136. Plaintiffs never had knowledge of, nor did they consent to, this conversion.

137. As a result of Defendants' actions, Plaintiff IOC has sustained damages in an amount to be determined at trial, but in excess of $9,299,500, plus interest, costs and attorneys' fees. Plaintiff AI Plus has sustained damages in an amount to be determined at trial, but in excess of $11,337,245 plus interest, costs and attorneys' fees.

## COUNT X

## ACCOUNTING

138. Plaintiffs incorporate here by reference all preceding paragraphs.

139. To protect Plaintiffs, it is necessary for Petters, PGW and PCI to provide an accounting of all funds transferred from any accounts of PCI sufficient for Plaintiffs to determine the purpose and recipients of all such transfers.

## COUNT XI

## UNJUST ENRICHMENT

140. Plaintiffs incorporate here by reference all preceding paragraphs.

141. Defendants have been unjustly enriched by obtaining Plaintiffs' money through unlawful means.

142. Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred by such ill-gotten income.

143. Plaintiffs seek disgorgement of all of monies Defendants have obtained or derived from Plaintiffs' investments.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief against Defendants as follows:

1.    Certify a plaintiff Class as defined herein;

2.    Appoint Plaintiffs IOC and AI Plus as Class Representatives;

3.    Appoint Plaintiffs' counsel Zimmerman Reed, P.L.L.P. as Class counsel;

4.    Award Plaintiffs treble damages, costs and attorneys' fees as authorized by the RICO Act, 18 U.S.C. § 1964(c);

35

5.   Award Plaintiffs all other direct and consequential damages as allowed by law;

6.   Award Plaintiffs equitable and injunctive relief, including but not limited to restitution and disgorgement;

7.   Award Plaintiffs costs and attorneys' fees against Defendants as otherwise allowed by law;

8.   Grant such other or further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated:  October 10, 2008.

ZIMMERMAN REED, P.L.L.P.

By: _____
Carolyn G. Anderson MN 275712
J. Gordon Rudd, Jr. MN 222082
Brian C. Gudmundson MN 336695
Kirsten D. Hedberg MN 344369
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402
T: 612.341.0400
F: 612.341.0844

ATTORNEYS FOR PLAINTIFFS AI PLUS INC.,
IOC DISTRIBUTION, INC. AND THE CLASS

 **ZIMMERMAN REED**
ATTORNEYS AT LAW

50327

October 10, 2008

BRIAN C. GUDMUNDSON
ADMITTED IN MINNESOTA
cga@zimmreed.com

REPLY TO MINNEAPOLIS

*Via Hand Delivery*

Mr. Richard D. Sletten
Clerk of Court
U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

    RE:    *AI Plus, Inc. and IOC Distribution, Inc., et al. v. Petters Group Worldwide, et al.*

Dear Mr. Sletten:

Enclosed for filing in the above-referenced matter, please find the following:

1)     Summons;
2)     Complaint; and
3)     Civil Cover Sheet.

Also enclosed is our check in the amount of $350.00, satisfying the filing fee.

Thank you for your assistance. If you have any questions, please do not hesitate to contact me.

Very truly yours,

ZIMMERMAN REED, P.L.L.P.

Brian C. Gudmundson

:mbk
Enclosures
cc:    AI Plus, Inc. (*via U.S. Mail*)
        IOC Distribution, Inc. (*via U.S. Mail*)

**MINNEAPOLIS** | 651 NICOLLET MALL, SUITE 501  MINNEAPOLIS, MINNESOTA 55402  TEL 612.341.0400 FAX 612.341.0844  ZIMMREED.COM

**SCOTTSDALE** | 14646 NORTH KIERLAND BLVD, SUITE 145  SCOTTSDALE, ARIZONA 85254  TEL 480.348.6400 FAX 480.348.6415  ZIMMREED.COM